1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF OREGON

9

10   JIMMY L. GRAZIER,              )
                                    )    No. 04-772-HU
11              Plaintiff,          )
                                    )
12        v.                        )
                                    )  FINDINGS AND RECOMMENDATION
13   JOANNE BARNHART, Commissioner  )
     of Social Security,            )
14                                  )
                Defendant.          )
15   _____)

16

17   Phyllis Burke
     4370 NE Halsey Street
     Portland, Oregon 97213
18        Attorney for plaintiff

19   Karin Immergut
     United States Attorney
20   District of Oregon
     Craig J. Casey
21   Assistant United States Attorney
     888 S.W. Fifth Avenue, Suite 1000
22   Portland, Oregon 97204-2024

23   David R. Johnson
     Special Assistant United States Attorney
24   701 Fifth Avenue, Suite 2900 MS/901
     Seattle, Washington 98104
25        Attorneys for defendant

26

27

28   FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Jimmy Grazier brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability benefits and Supplemental Security Income (SSI) benefits.

## Procedural Background

Mr. Grazier filed an application for disability and SSI benefits on April 21, 2000, alleging disability as of March 10, 1999. His date last insured is June 30, 2000. The application was denied initially and on reconsideration. A hearing was held before Administrative Law Judge (ALJ) Timothy C. Terrill on February 13, 2002. The Appeals Council remanded the decision for additional consideration. On March 5, 2003, the ALJ conducted a second hearing. On August 26, 2003, the ALJ issued a decision finding Mr. Grazier not disabled. The Appeals Council declined Mr. Grazier's request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born January 23, 1960, Mr. Grazier was 43 years old at the time of the ALJ's decision. He completed high school. His past relevant work is as a drywall applicator, taper, and construction worker.

## Medical Evidence

On January 11, 1999, Mr. Grazier was a passenger in a van when

FINDINGS AND RECOMMENDATION Page 2

the driver struck another car. Sheet rock which was lying flat on some benches in the back of the van slid forward, striking him in the back of the head or neck. Tr. 359-60, 239. Mr. Grazier developed neck soreness, which progressed over the next day to a severe bilateral occipital headache. Tr. 239. Mr. Grazier saw a chiropractor, Steve Lumsden, on a regular basis for three to four months. Tr. 560, 195-208.

He also received treatment from orthopedist Robert Berselli, M.D. Tr. 281. Dr. Berselli ordered an MRI on February 11, 1999, which showed a decrease in height of the C5 vertebral body, either developmental or the result of an old anterior wedge compression. Tr. 282. There was also circumferential bulging of the C6-7 disc, with possible impingement on the C7 root. Id.

About a week after the accident, Mr. Grazier noticed tingling in his fingers, hand, and forearm when he placed his arms above his head; he later developed weakness in the right arm. Tr. 239. Mr. Grazier was seen by a neurologist, Peter Cassini, M.D., on March 17, 1999. Tr. 239. Dr. Cassini reviewed the MRI showing a circumferential bulge of the C6-7 disc with extension into the right lateral recess. Tr. 240. Physical examination suggested a symptomatic disc herniation at the C6-7 level, resulting in a right C6-7 radiculopathy. Tr. 234, 240. Because of the progressive nature of the focal neural deficit, Dr. Cassini recommended surgical intervention. Tr. 240. Dr. Berselli referred Mr. Grazier to Darrell Brett, M.D. Id.

An MRI on September 9, 1999 showed a small disc herniation at

C6-7 and mild bulges at C5-6, C 4-5, C 3-4, and C 2-3. Tr. 278. An x-ray of the complete cervical spine on October 7, 1999, showed degenerative changes with prominent anterior spurring at C4-5 and mild posterior spurring at C5-6 and C6-7. Tr. 223.

Dr. Brett saw Mr. Grazier on November 4, 1999. Tr. 272. Dr. Brett noted that the MRIs showed moderate, but increasing disk protrusion centrally and to the right at C6-7. Tr. 272. There was also "evidence of spondylotic disease with osteophyte bridging anteriorly at C4-5 with some very minimal anterior compression at C5." Id.

Upon examination, Mr. Grazier was in moderate discomfort. Id. Cervical range of motion was reduced to 30 degrees in forward flexion and 10 degrees extension with moderate paracervical muscle spasm. Id. Dr. Brett's diagnosis was discogenic pain continuing at C6-7 as a direct result of the work injury. Tr. 273. Dr. Brett released him for light duty, provided he was not required to lift more than 25 pounds or perform any repetitive or heavy exertion of his neck or upper extremities, or maintain any awkward stationary positions that would aggravate his pain, such as working with his arms over his head, performing drywall installation, or taping. Tr. 273.

On January 14, 2000, Dr. Brett performed anterior cervical diskectomy, foraminotomy, and neural decompression followed by interbody fusion at C6-7. Tr. 258-60. In a January 31, 2000 chart note, Dr. Brett wrote, "Mr. Grazier returns today doing very nicely with resolution of all radicular pain, and he is extremely pleased

with the results of surgery. He has only slight dysesthesia which should resolve with remyelination, and his wound is healing well." Tr. 285. He was to be reassessed in two to three months with a repeat x-ray. Id. Dr. Brett thought his prognosis was excellent. Id.

On March 3, 2000, Mr. Grazier saw Syed Mustafa, M.D., an internist, for a physical evaluation. Dr. Mustafa noted "severely limited range of motion" in Mr. Grazier's neck and mild tenderness over the cervical spine. Tr. 244. In Dr. Mustafa's opinion, Mr. Grazier was limited to sedentary work, which was defined as the ability to lift a maximum of 10 pounds and the ability to stand and/or walk "a certain amount." Tr. 245.

On April 11, 2000, Dr. Brett wrote that Mr. Grazier was doing well except for occasional neck stiffness. Tr. 284. His radicular pain had not recurred and he was neurologically intact, with preserved strength, sensation and reflexes. Id. Cervical range of movement was reduced to a residual of 10 degrees in extension and 40 degrees in forward flexion with mild paracervical muscle spasm, and Dr. Brett thought this was likely to be a chronic condition with permanent loss of movement in the neck. Id. Dr. Brett thought he might require some physical therapy and occasional use of analgesics for symptomatic relief of the pain. Id. Dr. Brett considered Mr. Grazier medically stationary and released him for all activities without restriction. Id.

On April 24, 2000, Mr. Grazier was seen in the emergency room at Adventist Medical Center, for complaints of back pain. Tr. 249.

FINDINGS AND RECOMMENDATION Page 5

Examination revealed tenderness to palpation in the paraspinal muscles from approximately T6 to T8. He did not have spinous process tenderness. Strength was 5/5 throughout the upper and lower extremities. Reflexes were 2+ throughout. The emergency room physician, Sharon Peach, M.D., spoke to Dr. Brett, who recommended lateral cervical spine x-rays and a referral to his clinic. Tr. 250. Mr. Grazier was given Vicodin and Flexeril. Id.

On April 25, 2000, Dr. Brett wrote that Mr. Grazier had returned with complaints of symptomatic aggravation in the neck and interscapular pain after mowing his mother's lawn two weeks previously. Id. Neck x-rays taken the previous day showed "excellent appearance of his interbody fusion at C6-7," and some degenerative change at C4-5. Id. Dr. Brett thought it was residual discomfort from the disc pathology at C6-7 and probably a chronic cervical strain. Id. Dr. Brett wrote, "This discomfort will be chronic and permanent, and he may require intermittent physical therapy..." Dr. Brett did not think Mr. Grazier could return to his previous occupation as a dry wall installer, and limited his lifting and carrying to no more than 25 pounds, without any repetitive or heavy exertion with the arms or any awkward or stationary neck positions. Id. Dr. Brett wrote, "This constitutes a moderate permanent partial disability as a result of his motor vehicle accident." Id.

On April 28, 2000, Mr. Grazier saw Dr. Berselli for right lower extremity pain. An MRI of Mr. Grazier's lumbar spine showed no evidence of lumbar disc herniation. Tr. 276. Early degenerative

disc disease changes at L4-5 were noted, and there was evidence of some degenerative facet changes at L4-5 and L5-S1 with narrowing of the left neural foramina at L4-5, id., but Dr. Berselli did not think these findings were connected to Mr. Grazier's complaints of right lower extremity pain. Tr. 275.

On May 3, 2000, Mr. Grazier returned to the emergency room at Adventist Medical Center and was again seen by Dr. Peach. Tr. 247. He complained of pain on the right side of his back between the shoulder blades. Tr. 247. He denied numbness or tingling in the upper or lower extremities. Id. Dr. Peach diagnosed muscle strain and gave him Flexeril and six Vicoprofen tablets. Dr. Peach wrote,

> He is instructed ... not to return to this emergency department merely for narcotic pain medication refills. He understands that this is the last time he will get narcotic prescription medicine from this emergency department.

Tr. 247-48.

On May 22, 2000, Mr. Grazier saw Harold Lee, M.D., with complaints of dizziness, continuous numbness in the left dorsal side of the wrist and right foot, and inability to flex, extend or rotate his neck without pain. Tr. 299-300. Dr. Lee thought Mr. Grazier still had symptoms "that are correlated with clinical findings of chronic cervical pathology," tr. 302, and said he agreed with Dr. Brett that "patient is not able to return to his previous job. He probably needs sedentary/light duty work." Id.

On June 5, 2000, Mr. Grazier saw Dr. Lee again for neck pain. Tr. 298. Active range of motion of the neck showed flexion 35 degrees, extension 20 degrees, lateral rotation 35 degrees to the

FINDINGS AND RECOMMENDATION Page 7

left and 40 degrees to the right. There was persistent tenderness in the upper trapezius, splenius capitus, sternocleidomastoid, levator scapulae, supraspinatus, and teres major muscle group. Dr. Lee recommended more physical therapy. <u>Id.</u>

On July 5, 2000, Mr. Grazier saw Dr. Lee for an episode of fainting at home, which had resulted in his being transported to the emergency room. Tr. 297. The emergency room physician had provided Mr. Grazier with pain medication, including Vicodin and Flexeril. <u>Id.</u> Mr. Grazier reported to Dr. Lee that he was having increased pain in his neck, with headache and tightness. <u>Id.</u> Dr. Lee thought the fainting episode caused some further muscle irritation and recommended that Mr. Grazier resume physical therapy. <u>Id.</u> He also prescribed additional Vicodin. <u>Id.</u>

On July 12, 2000, Mr. Grazier saw Dr. Brett with complaints of neck discomfort. Tr. 283. Dr. Brett concluded that Mr. Grazier remained neurologically intact with preserved strength, sensation and myotatic reflexes. <u>Id.</u> He was able to heel and toe walk and repetitively toe stand without difficulty, and there were no findings to suggest myelopathy. <u>Id.</u> Cervical range of movement was only slightly reduced, with only mild paracervical muscle spasm, and his surgical wound was well-healed. <u>Id.</u> Dr. Brett noted that neck x-rays performed on July 1, 2000 showed excellent post-operative appearance. <u>Id.</u> Dr. Brett reassured Mr. Grazier "as to the benign nature of his discomfort." <u>Id.</u>

A Residual Physical Functional Capacity Assessment completed by Social Security reviewing physician Martin Kehrli, M.D.,

FINDINGS AND RECOMMENDATION Page 8

indicates that in his opinion, Mr. Grazier was capable of lifting 20 pounds occasionally and 10 pounds frequently, standing and sitting six hours out of an eight-hour workday, and that he had no significant limitations except for overhead reaching. Tr. 303-307.

On August 2, 2000, Mr. Grazier told Dr. Lee he was doing better as a result of the physical therapy program. Tr. 296. He was still having some dizziness and occasional lack of coordination, but had not had any more falling. Id. Dr. Lee thought Mr. Grazier had made minimal progress so far, and recommended that he continue with the physical therapy. Id. It was decided to try him on non-steroidal inflammatory medication rather than narcotic pain medication. Id.

On August 7, 2000, Mr. Grazier reported an acute pain episode after lifting a bag of produce. Tr. 295. The non-steroidal medication was not helping, so Dr. Lee prescribed Vicodin, twice a day. Id.

On August 18, 1999, Mr. Grazier was still reporting increased pain in his neck, though he was taking two Vicodin at night and two more during the day. Tr. 293. Mr. Grazier said he would have to leave his apartment at the end of the month and live in his car because he did not have employment and was unable to find public assistance. Id. His neck and cervical area were very tender, with occasional numbness and tingling down to the upper extremities. Id.

Dr. Lee concluded that he was not doing well. Id. He provided a month's supply of Vicodin, to be taken four times a day. Id. Dr. Lee thought that if the physical therapy was not helpful, invasive

muscular trigger point stimulation would be indicated, except that Mr. Grazier had "significant needle phobia." Id.

On August 23, 2000, Dr. Lee wrote that Mr. Grazier's neck continued to bother him. Tr. 292. Since he had to move out of his apartment, he was unable to continue physical therapy. Id.

On September 8, 2000, Mr. Grazier told Dr. Lee that he was living in his car, but that the police had come by to make sure he did not camp for more than two weeks in the Mt. Hood National Forest, so he had returned to town. Tr. 291. He asked for additional physical therapy, if possible. Id. Dr. Lee did not see any definite problem of acute cervical radiculopathy or myelopathy, but did think that "definite muscle irritation [is] going on." Id. Mr. Grazier was continued on his current medication.

On September 27, 2000, Mr. Grazier saw Tonja Janssen, M.D. Tr. 354. She told Mr. Grazier she was not able to fill out a form stating that he was permanently disabled. Id. She gave him a referral for an occupational medicine/rehabilitation evaluation.

On September 29, 2000, Mr. Grazier saw Dr. Lee, reporting that he was staying in a transitory housing facility. Tr. 290. His pain was not significantly changed, and he denied any unusual light-headedness, tingling, numbness, dizziness, chest pain, difficulty breathing or shortness of breath. Id. Depending on his activity level, he needed two to three tablets of Vicodin. Id. Dr. Lee prescribed Vicodin, one tablet every eight hours, and referred him to an occupational medicine provider. Id.

On October 5, 2000, Dr. Lee completed a "Verification of

Disability" form for Mr. Grazier, stating that he had a

> physical, mental or emotional impairment that is expected
> to be of long-continued and indefinite duration;
> substantially impedes his or her ability to live
> independently; and is of such a nature that ability to
> live independently could be improved by more suitable
> housing conditions.

Tr. 347. The form continued, "Based on the above definition, it is my opinion that the individual indicated above is disabled." Id.

On October 16, 2000, Dr. Janssen wrote that Mr. Grazier had been seen by Jennifer Lawler, M.D., at Rehabilitation Medicine Associates. Tr. 352. Dr. Lawler told Dr. Janssen that Mr. Grazier had "pronounced and seemingly exaggerated limitations in the cervical range of motion. She felt it was difficult to determine his true abilities and vocational destiny; however, she did think it was unlikely he could return to heavy physical labor and that he should be rehabilitated to perform light to medium category labor." Id.

Dr. Janssen spent approximately 30 minutes evaluating Mr. Grazier's psychological status. Tr. 353. He was given the Beck Inventory for Depression and Anxiety, but was not able to complete it "because he had a difficult time choosing the answer that corresponded best to his feelings." Id. Dr. Janssen noted that Mr. Grazier was "angry appearing," and "seems to smile inappropriately, often smiling when describing something very painful or stressful." Dr. Janssen told Mr. Grazier she was "concerned about his current psychiatric condition." She did not "believe he has anything such as simple anxiety or depression; however, this may be mixed in with his diagnosis. ... I believe he may benefit from seeing an actual

FINDINGS AND RECOMMENDATION Page 11

psychiatrist for an evaluation and I will discuss this with his counselor." Id.

On November 8, 2000, Dr. Janssen wrote that she was working with Mr. Grazier on smoking cessation, after treating him for acute bronchitis. Tr. 350.

On January 19, 2001, Dr. Janssen saw Mr. Grazier for headache over the past two weeks, progressively worsening, and associated with slight nausea. Tr. 348. Dr. Janssen noted a history of a solitary pulmonary nodule, likely a granuloma, which was noted on a chest x-ray in November 2000 and was followed up with a CT scan.

On January 29, 2001, Mr. Grazier returned to Dr. Lee with complaints of increased pain in his neck. Tr. 344. Mr. Grazier requested four tablets of Vicodin a day. Tr. 344. Dr. Lee found that Mr. Grazier's condition was worse than before "in terms of range of motion," after examination revealed flexion at 30 degrees, extension at 10 degrees, lateral rotation 25 degrees to the left and 30 degrees to the right, lateral bending 15 degrees bilaterally. Id. Dr. Lee gave Mr. Grazier 45 Vicodin tablets, but did not recommend that he take more than two or three a day. Id.

On March 12, 2001, Mr. Grazier was seen by Mark Yerby, M.D., a neurologist, for complaints of dizziness, fainting spells, and pain in the neck, upper and lower back, as well as occasional headaches. Tr. 359. Dr. Yerby observed that Mr. Grazier's gait was normal, although he tended to move very slowly. Tr. 361. He could do a full squat and rise, walk on his heels or toes, and tandem walk without difficulty. Id. His muscle strength was 5/5 throughout

FINDINGS AND RECOMMENDATION Page 12

and his reflexes were 2+ and symmetrical in the upper and lower extremities. Tr. 362. He was intact to touch, temperature, pin and vibration except for diminished sensation to pin over the left ulnar aspect of the forearm, and inconsistently diminished to temperature over the left cheek, neck and hand. Id. His cervical/lumbar range of motion was decreased in all directions. Waddell's[1] was positive in rotation, but not compression and traction. Id. He was tender to palpation in the midline at C3, C4, T4 and L4. He had paraspinal muscle tenderness in the right neck at C4-5 and the right trapezius. Id.

Dr. Yerby concluded:

> On neurological examination he has limitation of motion of his cervical spine consistent with a cervical fusion but more restricted than one would expect. His positive Waddle's [sic] is suggestive of a functional contribution to his examination. The areas of tenderness do not correspond to the historical level of the surgery. His complaints of constant dizziness are more difficult to explain. He has bilateral hearing loss but no other findings suggestive of VIII nerve dysfunction.

Tr. 363. Dr. Yerby ordered a sleep-deprived EEG, vestibular

---

[1] When evaluating patients complaining of back pain, physicians employ the term "Waddell's signs" (comprising eight clinical findings) to indicate that one or more complaints of pain are not caused by physical abnormality. The presence of three or more of these findings is "usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality." Attorneys Medical Deskbook 3d § 11:2 (1993).

FINDINGS AND RECOMMENDATION Page 13

studies, and tympanogram. Id. The EEG was normal. Tr. 364. The vestibular study was normal except in the area of sensory organization, which showed a mild vestibular dysfunction pattern. Tr. 367. An audiogram indicated mild to moderate bilateral high frequency hearing loss in both ears, but word recognition scores were good bilaterally. Tr. 365.

Mr. Grazier saw Dr. Lee on May 2, 2001, for neck pain. Tr. 405. Mr. Grazier related that his medication had been stolen, and Dr. Lee agreed to write another prescription. Id.

On May 23 and May 25, 2001, Mr. Grazier was given a psychological evaluation by Donna Wicher, Ph.D. Tr. 308-313. Mr. Grazier reported increasing problems with depression, decreased memory and concentration, and suicidal ideation that had been constant since the motor vehicle accident. Tr. 309. He also reported frequent waking at night, because of pain. Id.

Upon observation, Dr. Wicher found no obvious problems with memory or concentration. His affect was "rather flat," and he displayed very little facial animation. Id. Mr. Grazier reported that he was currently living in a homeless shelter with approximately 100 other residents. Tr. 310. He said he could walk only on a limited basis because of pain, but denied restrictions in activities of daily living and denied having problems getting along with other people, although he noted that he is a "no bullshit person" and treats other people as they treat him. Id.

Mr. Grazier was given several psychological tests. Id. No obvious concentration defects were present during examination; his

FINDINGS AND RECOMMENDATION Page 14

persistence was adequate and he willingly attempted and pursued all tasks. Id. Intelligence testing placed his overall level of functioning in the Average range of intellectual ability. He achieved a Working Memory Index Score of 92, which was consistent with the IQ score, and which reflected normal abilities in attention and memory. Id.

Mr. Grazier's profile on the Minnesota Multiphasic Personality Inventory (MMPI-2) was "invalid due to excessive endorsement of unusual items." Id. The examiner noted that similar profiles are produced by individuals either because they are confused and do not understand what they are reading, are experiencing severe psychological distress, or are attempting to exaggerate their level of emotional distress. Tr. 311. The examiner did not think Mr. Grazier appeared to be confused during the examination and did not appear to be in extreme psychological distress; she concluded that his profile mostly likely reflected an attempt to exaggerate his level of emotional distress. Id.

Mr. Grazier reported a past history of substance abuse, including the use of crystal methamphetamine on a regular basis until the motor vehicle accident. Id. He said that at one time he was the financial backer for a cocaine dealer. He had also been convicted of rape and possession of a controlled substance. Id. Despite the convictions, he reported that he has served only about two weeks in jail. Id. He reported arrests "too numerous to recall," including for driving while intoxicated, driving without insurance, and driving with a suspended license. He said he has

driven illegally most of his life.

Dr. Wicher diagnosed Major Depressive Disorder, Single Episode, Moderate; Polysubstance abuse, presently in remission; and Antisocial Personality Disorder. Id. She noted that Mr. Grazier had recently begun to receive medication and counseling to treat his depression, but continued to complain of significant symptoms. Tr. 312. Dr. Wicher thought it likely that Mr. Grazier would continue to experience depressive symptoms until he had greater stability in his living situation and his income. Id. Further, she thought it likely that Mr. Frazier would continue to manifest his underlying personality disorder, and that he also remained at some risk for relapse into substance abuse, because individuals with Antisocial Personality Disorder often experience dysphoric mood, and his previous substance abuse might have been an attempt at self-medication. Id. In Dr. Wicher's opinion, Mr. Grazier had normal intelligence and did not show signs of organic brain impairment. Tr. 313. She found no restrictions in his activities of daily living and noted that he "claims to have adequate social functioning, although he does appear to be somewhat intolerant of other people." Id. In Dr. Wicher's opinion, Mr. Grazier's attention and concentration appeared to be adequate during the interview and on testing; there were no obvious difficulties with persistence or pace. Id. She found "no obvious psychological barriers to returning this man to work at the present time." Id.

On May 23, 2001, Mr. Grazier reported to Dr. Lee that he still had neck pain. Tr. 404. He was trying to get into a vocational

program. _Id._ He was continuing to take Vicodin. _Id._ Dr. Lee wrote that he had requested copies of the police reports of two previous incidents when Mr. Grazier reported that his pain medication was stolen. _Id._

On June 27, 2001, Mr. Grazier saw Dr. Lee for increased pain over his neck and shoulder area and occasional numbness and tingling in the arms and hands. Tr. 403. He was currently trying to get some vocational assistance from the state. _Id._ Dr. Lee did not think Mr. Grazier was eligible for a pain center program. He thought Mr. Grazier's primary care physician should consider invasive muscular trigger point injection and stimulation and/or epidural block, "since the passage of time and medication do not seem to help his condition at this time." _Id._ Dr. Lee wrote, "He is not qualified physically for any work that is beyond light duty work." _Id._

Dr. Lee saw Mr. Grazier again for pain on July 25, 2001. Tr. 402. He denied any unusual numbness, tingling or swelling in the upper extremities. _Id._ Dr. Lee thought Mr. Grazier needed MRI studies to assess his disk condition for any post-operative changes or another disk problem. _Id._ He recommended a daily stretching exercise program as well as medication for pain control. _Id._

From July 27, 2001 to January 15, 2003, Mr. Grazier received counseling services from Carla Welker, MSW. Tr. 368-397, 427-452.[2]

_____

[2] It appears from the record that Mr. Grazier received counseling services from Ms. Welker through two entities, Unity, Inc. and Cascadia Behavioral Healthcare.

On August 27, 2001, Mr. Grazier told Dr. Lee he was going to have to "live on the mountain" again because he had not started any vocational training and therefore had to move out of his current residence. Tr. 401. He asked Dr. Lee for a month's supply of medication. Id. Mr. Grazier told Dr. Lee his "shoulder is more of a problem than the neck," but he still "has a complaint of headache, and constant tightness and stiffness in the shoulder/neck region especially in the right side." Id. Dr. Lee wrote,

> This patient is in need of some medical attention, but because of his social situation, he does not have any resources at this time. He will need some vocational training and some housing and food assistance, and I am at a loss as to how to help this patient medically. I will provide medication, which is the only alternative treatment for his chronic pain. When he calls me to inform me of his move to the mountain, I will provide one month ... supply of medication.

Id.

On September 14, 2001, Ms. Welker referred Mr. Grazier to Ryles Center Crisis Respite Program. Tr. 407-425. He remained there for two days, receiving counseling and being given Serozone and Vicodin. Upon admission, he was observed to be "guarded, but cooperative;" however, the following day, a chart note stated that he was "questioning a lot of the rules," and was "pushing limits and med seeking." Tr. 418. Chart notes for September 16 noted that he was "unable to track conversation, perseverated on guns, people interfering with his rights." Tr. 420. He was thought to be "too acute for respite setting," but not a threat to himself or others and therefore ineligible for Ryles's more secure unit. Id.

According to the Mobile Crisis Team Contact Log for Unity,

Inc., a staff member at the Ryles Center named Loretta had contacted Joan Stein at Unity because she was "concerned that [Mr. Grazier] needed a higher level of care than the respite program offered." Tr. 382. Loretta told Ms. Stein Mr. Grazier appeared paranoid and hostile, and that they "thought he might be responding to internal stimuli." Id. Mr. Grazier had reportedly had an altercation with a bus driver earlier in the day "which they believed was a result of his paranoid thinking." He had made what Ryles staff thought were vague threats. Id. Ms. Stein went to Ryles Center and interviewed Mr. Grazier, with police present, on the porch of the Ryles Center. Id. Mr. Grazier was reportedly agitated by the police presence, but was cooperative with answering questions. According to Ms. Stein, he "maintained an [angry] tone throughout most of the interview," saying he felt "persecuted by anyone that attempts to structure his life." Id. Mr. Grazier stated that he wanted to take his medications on his own schedule, which was different from the schedule as prescribed, because he had an "informal agreement" with his prescriber about his medication schedule; the Ryles Center staff had insisted on dispensing the medication as prescribed. Id. See also tr. 418 (progress note from Ryles Center stating that Mr. Grazier said he was "insulted" about not being able to take his medications whenever he wanted.)

Ms. Stein discussed possible voluntary hospitalization, but Mr. Grazier refused. Id. Ryles Center offered to move Mr. Grazier to the subacute section of their program, but he refused. Id. Mr. Grazier was discharged from the Ryles Center on September 16, 2001,

at his own request, with the notation that he had become "increasingly hostile and verbally aggressive." Tr. 408-09.

On September 21, 2001, Ms. Welker completed a questionnaire on Mr. Grazier's psychiatric condition and a form entitled,"Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment." Tr. 338-343. In Ms. Walker's opinion, Mr. Grazier had marked difficulties in maintaining social functioning and extreme difficulties in maintaining concentration, persistence or pace. Id. Ms. Walker thought Mr. Grazier's symptoms of depression, "including his difficulty with concentrating, feeling hopeless, agitated, low energy all impede his ability to function socially." Tr. 339. Ms. Walker also explained that during therapy sessions, Mr. Grazier would "stop mid-way, forgetting what he wanted to share." Ms. Walker stated further that Mr. Grazier was "in obvious chronic neck and back pain," that he "walks slowly, gets up slowly and carefully." Id. Ms. Walker thought Mr. Grazier had moderately severe limitations on his ability to understand and remember very short and simple instructions, and severe limitations on his ability to understand and remember detailed instructions. Tr. 341. She also rated as "severe" and "moderately severe" Mr. Grazier's limitations in the following areas: ability to carry out short and simple instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to work in coordination with or in proximity to others, ability to complete a normal workday, and ability to accept instructions and respond to criticism. Tr. 342-

43.

On October 8, 2001, Mr. Grazier saw Dr. Lee, reporting that he got involved in a physical confrontation with some people in the campsite on the Sandy River where he was staying. Tr. 400. Mr. Grazier said he had been beaten with a club over the shoulder and neck area. Id. He was seen at Mt. Hood Medical Center by an emergency room physician. X-rays showed no fractures. Id. Mr. Grazier was wearing a sling and complained of significant pain in his right shoulder and neck area, and numbness and tingling in the right arm. Id. He had been given Vicodin in the emergency room and still had about a week's supply. Id. Dr. Lee wrote, "I will provide more medication when his current supply is out in one week or so." Id. He recommended physical therapy, including gentle stretching, massage, ultrasound, hot pack and cold pack to the shoulder. Id.

On October 17, 2001, Mr. Grazier was given a 60-minute psychiatric assessment at Unity, Inc. by John Bischof, M.D. Tr. 396-97. Mr. Grazier stated that he was currently on Serzone, Zyprexa and Vicodin. Tr. 396. Mental status examination indicated that Mr. Grazier was "somewhat psycho-motor slowed," that his affect was "somewhat labile," that he was irritable, his thoughts circumstantial and disorganized at times. Id. His short term and long term memory were intact to testing, his insight was considered fair, and his judgment was intact. Tr. 397. Dr. Bischof's diagnosis was Major Depressive Disorder, recurrent, severe, with psychotic features; polysubstance dependence in sustained remission, and Personality Disorder, Not Otherwise Specified (NOS). Id.

On November 7, 2001, Megan O'Keefe, a case manager for Transition Projects, a housing program, wrote a letter on Mr. Grazier's behalf. Tr. 188. She stated that she had known him for about two years and had been working with him on a weekly basis for about a year, assisting him toward self-sufficiency. Id. Ms. O'Keefe said Mr. Grazier had adhered to all the rules and policies of the shelter, and had followed through with his responsibility for two hours of communal chores, "although this has been physically difficult." Id. Ms. O'Keefe said she had observed that Mr. Grazier had "appeared to be in pain and even while sitting in the chair in my office it seems as though he has just not been comfortable." She related that Mr. Grazier had to "hold his shoulder up and has always responded that this is the most comfortable way for him to be without being in pain." Id. Ms. O'Keefe said, "It has been difficult to refer Mr. Grazier towards employment as I do not feel that he has been capable to withstand [sic] working right now." Id.

On December 14, 2001, Mr. Grazier reported to Dr. Lee that he had obtained housing through the housing authority and was entering a vocational program. Tr. 396. He had also obtained a prescription for physical therapy. Id. Mr. Grazier said he had pain in his right arm. Id. Mr. Grazier told Dr. Lee that the doctor at the physical therapy had not given him any pain medication, so Dr. Lee provided Vicodin. Id.

On January 28, 2002, Mr. Grazier reported doing "somewhat better" with the physical therapy, noticing that movement of the

FINDINGS AND RECOMMENDATION Page 22

shoulder had improved. Tr. 398. He had submitted an application for an educational loan in order to pursue becoming a building inspector. Id. Dr. Lee thought Mr. Grazier had "made steady progress." Id. He advised Mr. Grazier to have a liver function test "due to chronic use of current narcotics." Id. They discussed reducing his medication in the near future. Id.

On April 30, 2002, the Hearing Officer Panel of the Oregon Department of Human Services reversed the initial decision of the Department and awarded Mr. Grazier general assistance (GA) benefits, finding that he had a mental impairment which equaled Listing 12.04 of the Listing of Impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1.[3]

## Hearing Testimony

At the first hearing on February 13, 2002, Mr. Grazier stated that during the past 15 years he had worked for Swain Construction, where he was a working foreman, master taper and finisher, and for a Mr. Woodley as a handyman for his rentals. Tr. 486-87. After the motor vehicle accident, when Mr. Grazier was restricted to light duty, he worked as a "gofer" for Mr. Swain and patched holes in

---

[3] Former Oregon Administrative Rule (OAR) 461-125-510 provides that to be eligible for GA, an individual must have a physical or mental impairment or combination of impairments that meet or equal a listing in the Listing of Impairments. Tr. 475. The rule was amended effective April 1, 2002, to refer to the Listing of Impairments in effect on February 19, 2002. Id.

FINDINGS AND RECOMMENDATION Page 23

drywall. Tr. 488. Mr. Grazier testified that before the surgery, his hands and legs were going numb, he was getting dizzy spells "all the time," and he had pain in both shoulders, the left being worse, so that he could not "lift anything of any kind of weight." Tr. 489-90. Since the surgery, the pain was gone from his left arm, but increased on the right. Tr. 490. Mr. Grazier said that after the surgery, the numbness got better, but he continued to have pain in his neck and headaches. Tr. 490. Mr. Grazier testified that about once a month, his neck gets tense and his muscles knot up, and he gets a severe headache that lasts a full day. Tr. 492. He takes Vicodin for the headaches, which he said merely "deadens" the pain. Id. Mr. Grazier testified that he can no longer look over his shoulders and cannot look up or down for more than about 10 minutes at a time. Tr. 493. When he reaches his arms over his head, his hands start to go numb. Tr. 494. He can carry only about 10 pounds before his neck and head begin to hurt. Tr. 494-95. Mr. Grazier testified that walking aggravates the pain in his neck because stepping up or down jars his spinal column. Tr. 495. He cannot sit for more than about half an hour to 45 minutes before needing to lie down. Tr. 496. Mr. Grazier testifies that he can become dizzy at any time, from standing up or sitting down. Tr. 496.

After losing his job at Swain Construction, Mr. Grazier lost the trailer he had lived in. Tr. 497. He stayed at friends' houses, camped out, stayed briefly with his mother, and stayed in a variety of shelters. Tr. 498. He is currently living in a public housing SRO. Tr. 499.

FINDINGS AND RECOMMENDATION Page 24

Mr. Grazier testified that he has a history of problems with authority and dealing with anger, relating an incident from high school in which he threw a knife at other students who were taunting him and difficulty following orders during his brief time in the military. Tr. 501, 507. Mr. Grazier also related problems working with some of Mr. Swain's subcontractors. Tr. 508. Mr. Grazier said two of his siblings had obtained restraining orders against him, causing him to be "kicked out of my mom's place." Tr. 510. He also described an incident which occurred the day of his general assistance hearing, when he went across the street to a hardware store and then was accused of stealing a machete. Tr. 511. The police came to the building where the hearing was to be held and Mr. Grazier got into a verbal altercation with them. Id.

Mr. Grazier said he has trouble concentrating and remembering, even with the medication he was being given, and that his ability to remember fluctuates with the pain he is in throughout the day. Tr. 516.

Vocational expert (VE) Michael Ott was called. The ALJ asked him to consider a hypothetical individual of Mr. Grazier's age, and with his previous work history, limited to sedentary work, precluded from overhead work, need to balance, concentrated hazards, and work requiring interaction with members of the public, and with only occasional interaction with coworkers. Tr. 520. Mr. Ott opined that such a person could perform the work of a sorter, electronics assembler, or hand packager, all classified as sedentary and unskilled. Id.

Mr. Ott was asked by Mr. Grazier's counsel whether a preclusion on repetitious use of the arms, or maintaining awkward or stationary positions of the neck for more than a brief period, or an inability to tip the head up or down for more than 10 minutes at a time, would rule out any competitive employment. Mr. Ott's response was yes. Tr. 522-23.

At the second hearing on March 5, 2003, the ALJ received into evidence the opinion of the Department of Human Services awarding Mr. Grazier GA benefits. Tr. 529-30. Mr. Grazier testified that he was still seeing Ms. Welker, on a monthly basis, and was still taking Zyprexa and Serzone for depression and Doxepin as a sleep aid. Tr. 533. Mr. Grazier testified that his depression was improved, because he had a place to live. Id. He testified that he avoids contact with other people as much as possible, but has altercations with other residents about noise. Tr. 534.

Mr. Grazier stated that his primary care physician still provides Vicodin for neck pain, two 500 mg. pills per day. Tr. 535-36. Mr. Grazier said he still gets dizzy when he stands up and sometimes when walking, and that he still passes out, finding himself "on the floor once or twice a week." Tr. 541, 542. Mr. Grazier described his activity level as "minimal," stating that usually he just stays in his room and on his bed. Tr. 542. He sleeps 16-17 hours out of 24, because he is "pretty much always tired." Id. Mr. Grazier testified that he is continuing with vocational rehabilitation efforts, trying to get "re-schooled and get back into the work force," tr. 543, and that he was scheduled

FINDINGS AND RECOMMENDATION Page 26

to meet with a vocational rehabilitation counselor the following day to get a grant so that he could go back to school. Id. Mr. Grazier's intention was to work as a building inspector. Tr. 544. Mr. Grazier testified that he felt physically able to perform the work of a building inspector, including being able to "walk the floor" and "look up to be able to make sure that you've got your, your studs acting as plates in the corner," and to "look up at the sheet rock" to "count the nails in the field and around the perimeter," climb a ladder, and, on occasion, climb up into attics or down into crawl spaces. Tr. 545-46.

The ALJ called VE Elayne Lales. Tr. 547. She testified that building inspector is a light, skilled job according to the Dictionary of Occupational Titles (DOT). The ALJ asked Ms. Lales to consider a hypothetical worker with the same age and educational and vocational background as Mr. Grazier, limited to sedentary work, precluded from overhead lifting, balancing, or working around hazards, and from interaction with the public, and having only occasional contact with coworkers. Tr. 548-49. Ms. Lales opined that such a person could work as a packager, assembler, or sorter. Tr. 549.

The ALJ continued the hearing to May 6, 2003, to take additional testimony from another VE, Robert Male. Tr. 554. Mr. Male characterized Mr. Grazier's previous work as a drywall applicator as semiskilled and heavy, and his previous work as a taper as skilled and medium. Tr. 558. The ALJ asked Mr. Male to consider an individual with Mr. Grazier's age, educational and

vocational background, limited to sedentary work, but precluded from overhead work or work that required balancing or exposure to unprotected heights, moving equipment or machinery, precluded from work requiring interaction with the public, and having only occasional interaction with co-workers. Tr. 560. The ALJ clarified that by "interaction," he did not mean physical proximity, but rather coordination and cooperation with others to produce a joint work product. Id. Mr. Male stated that such an individual would be precluded from Mr. Grazier's past relevant work, but would be able to work in sorting, quality control, and light assembly. Id. When given the additional limitation of being unable to do repetitive exertion with the arms and avoiding awkward or stationary neck positions, Mr. Male responded that there was no work in the national economy that could be done by such an individual. Tr. 562.

## ALJ's Decision

The ALJ found that Mr. Grazier had the following severe impairments: degenerative disc disease of the cervical spine; cervical strain; major depressive disorder; personality disorder; and polysubstance abuse, in full sustained remission. Tr. 22. He did not find that these impairments, singly or in combination, met or equaled a listed impairment.

The ALJ acknowledged that Mr. Grazier's degenerative disc disease and history of cervical fusion could reasonably be expected to result in some pain and limitation in range of motion, but found that "the medical and psychological evidence suggests that the claimant has exaggerated his symptoms." Tr. 27. The ALJ noted that

evidence of such exaggeration of physical and mental symptoms appeared in the reports of Dr. Yerby, Dr. Lawler, and Dr. Wicher.

The ALJ found that the opinions of Doctors Brett, Mustafa and Lee were not supportive of Mr. Grazier's allegation of complete disability. He noted that in January 2000, Dr. Brett had found Mr. Grazier able to return to work after his surgery so long as he did not lift 35 pounds; on April 11, 2000, Dr. Brett released Mr. Grazier for all activities without restriction; and on April 25, 2000, Dr. Brett found that Mr. Grazier could lift no more than 25 pounds and was unable to perform heavy exertion with his upper extremities or maintain awkward or stationary neck positions. The ALJ noted that Dr. Mustafa concluded in March 2000 that Mr. Grazier was limited to sedentary work, while Dr. Lee opined in May and June 2000 that Mr. Grazier was limited to work that was sedentary or light in exertion. Tr. 27-28.

The ALJ found no evidence to substantiate Mr. Grazier's claims that he was required to lie down after 30-45 minutes of sitting, or that it was medically necessary for him to sleep 16 to 17 hours a day. Tr. 28. The ALJ found that Mr. Grazier had not reported problems with sitting, or fatigue, to any of his treating physicians, and had reported to Ms. Welker in April 2002 that he was sleeping excessively because he had little else to do. Id. The ALJ rejected Mr. Grazier's testimony that he passes out once or twice a week because of dizziness on standing up, because there were no medical records to document that he had reported this problem to any physician. Id.

FINDINGS AND RECOMMENDATION Page 29

The ALJ also found Mr. Grazier's efforts at vocational rehabilitation inconsistent with his allegations of disabling pain and physical impairment, noting that in the hearing, Mr. Grazier had testified that he planned to attend classes at Portland Community College with a view to becoming a building inspector, and that he believed he would be capable of performing the job, which would require several years of schooling. Id.

The ALJ found Mr. Grazier's credibility further diminished by his history of criminal behavior, including a rape conviction, providing financial backing for a cocaine dealer, two convictions for possession of a controlled substance, and a long history of illegal driving. Id.

The ALJ stated that he had given significant weight to the opinions of the Agency's reviewing physicians, who concluded that Mr. Grazier was capable of light work without overhead reaching above the shoulder, and to consistent opinions of Dr. Brett in April 2000 and Dr. Lee in May 2000 and June 2001 that Mr. Grazier could perform light work except for limitations on his ability to reach overhead. Tr. 29. The ALJ gave little weight to the opinion of Dr. Mustafa because the opinion was given while Mr. Grazier was recovering from surgery, and because Dr. Mustafa saw him only once. Id.

The ALJ rejected the opinion of Dr. Brett, given both before and after the surgery, that Mr. Grazier was precluded from performing repetitive exertion with the upper extremities and was unable to maintain awkward or stationary neck positions, on the

ground that they were "not supported by any objective evidence or the opinion of other treating or examining physicians and appear to be based solely on the subjective reports of the claimant." Id. The ALJ found that these restrictions were also inconsistent with Mr. Grazier's reported activities of daily living, including playing Nintendo and watching movies. Id.

The ALJ also rejected Dr. Lee's statement on the "Verification of Disability" form that he was disabled, because Dr. Lee did not check the box corresponding to disability as defined in the Social Security Act; rather, he indicated that Mr. Grazier had an impairment that could be improved by more stable housing conditions. The ALJ found, "This conclusory statement was provided to assist the claimant in obtaining housing placement and it was not accompanied by a report of any objective findings to support such a conclusion." Id. The ALJ also rejected this statement as inconsistent with Dr. Lee's June 2001 opinion that Mr. Grazier could perform light work, an opinion consistent with that of the state agency reviewing physicians. Tr. 44.

The ALJ found that Mr. Grazier experienced limitations in his ability to interact with others, but rejected the findings of Carla Welker, on the grounds that she was not an acceptable medical source, and her conclusions were inconsistent with Mr. Grazier's daily activities and the evaluation performed by Dr. Wicher.

In reaching his conclusions with respect to Mr. Grazier's residual functional ability, the ALJ also considered statements provided by Mr. Grazier's friend, Ronda Hyson, in a questionnaire

FINDINGS AND RECOMMENDATION Page 31

completed June 8, 2000, tr. 154-62, and the letter submitted by Megan O'Keefe, case manager of Transition Projects. The ALJ found their observations credible "to the extent they report their observations of the behaviors the claimant demonstrates," but discounted them because the witnesses had "no medical expertise," so that their opinions were of limited value on how Mr. Grazier's impairments affected his overall abilities to perform basic work activities.

The ALJ noted, in addition, that although Ms. Hyson had corroborated Mr. Grazier's testimony that he naps once or twice a day for one to two hours, that he experiences dizziness almost every time he stands up, and had experienced increased pain since beginning physical therapy, she had also reported in June 2000 that she saw Mr. Grazier only two to three times per week, tr. 154, and was unable to provide any specific information about how Mr. Grazier typically spent his day. See tr. 160. The ALJ concluded that such relatively limited observation precluded him from accepting these statements. The ALJ noted that Ms. O'Keefe's observation that Mr. Grazier often appeared to be in pain was qualified by her statement that Mr. Grazier was able to perform his assigned communal chores. Tr. 24.

In addition to his findings, based on the observations of Doctors Yerby and Wicher, that Mr. Grazier had exaggerated his symptoms, the ALJ disbelieved Mr. Grazier's testimony about pain and inability to concentrate or remember because he was able to do light duty work until March 10, 1999, but not thereafter; and

because Mr. Grazier's repeated efforts at vocational rehabilitation were inconsistent with his allegations of disabling pain and physical impairment. Tr. 27, 28.

The ALJ accepted the psychological findings of Dr. Wicher that Mr. Grazier did not evidence difficulties with memory and concentration, and her conclusion that there were "no obvious psychological barriers to returning this man to work at the present time." He rejected the opinion of Ms. Welker because it was "inconsistent with the claimant's daily activities and the treatment record as discussed above and with the opinion of examining psychologist Donna Wicher, Ph.D." Tr. 26. The ALJ further found that although Ms. Welker had a treatment relationship with Mr. Grazier, an MSW is not generally considered to be an acceptable medical source under Social Security regulations. Tr. 26-27.

The ALJ noted Dr. Brett's opinion in November 1999, before the surgery, and again on April 25, 2000, after the surgery, that Mr. Grazier could not lift more than 25 pounds or perform any repetitive or heavy exertion of his neck or upper extremities or maintain any awkward positions. Tr. 27. The ALJ stated that he gave "significant weight" to Dr. Brett's opinions. Tr. 44. The ALJ also noted the opinion of treating physician Dr. Lee in May 2000 and June 2001 that Mr. Grazier was limited to sedentary or light work, and the opinion of Dr. Mustafa that Mr. Grazier was limited to sedentary work. Tr. 27, 44. However, as noted above, the ALJ gave Dr. Mustafa's opinions little weight. See tr. 29.

The ALJ concluded that Mr. Grazier retained the residual

functional capacity to do sedentary work, which encompassed the ability to lift up to 10 pounds, and to stand and walk two hours out of an eight hour day, except that he was precluded from overhead work, balancing, working around hazards, and work involving public interaction. Tr. 44. The ALJ did not, however, specifically refer to Mr. Grazier's testimony at the second hearing that he felt physically able to perform the work of a building inspector, including looking up, going up ladders, and climbing into attics or crawl spaces, tr. 545-46, suggesting that Mr. Grazier himself felt able to do more than sedentary work.

The ALJ found further that Mr. Grazier was limited to only occasional interaction with co-workers. Id. On the basis of these impairments, the ALJ found that Mr. Grazier could not return to his past relevant work, but that he was able to do other work in the national economy, including sorter, electronics assembler, and hand packager.

## Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative

record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two,

to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant

has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

In <u>McCartey v. Massanari</u>, 298 F.3d 1072 (9th Cir. 2002) court held, as a matter of first impression, that the ALJ must ordinarily give great weight to a Veterans Administration determination of disability. Court did so because of the "marked similarity between these two federal disability programs." 298 F.3d at 1076.

## Discussion

Mr. Grazier asserts that the Commissioner erred in the following respects: 1) implicitly rejecting Dr. Brett's opinion that Mr. Grazier could not perform any repetitive exertion with the upper extremities or maintain any stationary neck positions; 2) providing insufficient reasons for rejecting the lay witness statements and opinions of Ms. Welker; 3) implicitly rejecting the findings of Oregon's Department of Human Services that Mr. Grazier met the requirements for Social Security Listing 12.04; 4) providing the VE with a hypothetical which failed to include all of Mr. Grazier's limitations; and 5) failing to identify and consider all of Mr. Grazier's severe impairments. Mr. Grazier urges the court to reverse the Commissioner's decision and remand for payment of benefits.

1. <u>Rejection of Dr. Brett's opinion that Mr. Grazier could not perform any repetitive exertion with the upper extremities or maintain any stationary neck positions</u>

Mr. Grazier asserts that the ALJ failed to provide valid

reasons for not adopting Dr. Brett's post-operative opinions on January 31, 2000 and April 25, 2000, that he should not perform any repetitive exertion with the upper extremities or maintain any awkward or stationary neck positions. He argues that had the ALJ accepted these findings, the ALJ would have been compelled to find Mr. Grazier disabled at step five, in accordance with the testimony of VEs Ott and Male.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine but do not treat; and 3) those who neither examine nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan, 246 F.3d at 1202; Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan, 246 F.3d at 1202, see also 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, see id. and § 404.1527(d)(5). As Mr. Grazier points out, Dr. Brett was a treating physician dealing with a matter relating to his specialty.

When a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Reddick,

FINDINGS AND RECOMMENDATION Page 38

157 F.3d at 725. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. This can be done by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation of them, and making findings. Id. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Id.

The ALJ's stated reasons for rejecting Dr. Brett's opinion that Mr. Grazier was precluded from repetitive exertion with the arms and unable to maintain awkward or stationary neck positions were that 1) these restrictions were not supported by objective evidence, but only by Mr. Grazier's subjective complaints, 2) the restrictions were inconsistent with Mr. Grazier's reports of his activities of daily living, including playing Nintendo and watching movies, and 3) there was no evidence that Mr. Grazier ever subsequently complained of this extreme limitation in range of motion or sought treatment for it.

The first of the ALJ's reasons for rejecting the opinion is contradicted by his own findings and by the medical record. The ALJ found that Mr. Grazier's degenerative disc disease and history of cervical fusion "can reasonably be expected to result in some pain and limitation in range of motion." Tr. 27. Further, there is ample objective evidence of conditions that can be expected to cause pain and limited range of motion of the neck, summarized at page 3, line

8 to page 9, line 10. For these conditions he had surgery in hopes of improving them. Surgery is an objective, invasive procedure that can be expected to cause discomfort and restrictions despite our hopes it will improve things. It is just not accurate that there is no objective evidence here.

The ALJ's finding that Dr. Brett's restrictions were inconsistent with Mr. Grazier's testimony that he was able to play Nintendo and watch movies is not a sufficient basis to reject Dr. Brett's opinion because it misapprehends Mr. Grazier's testimony. Mr. Grazier said that he engaged in these activities by putting pillows against a wall and leaning back against the pillows so that his head was resting against the wall. Tr. 495. Mr. Grazier testified that he could perform these activities in that position for about half an hour. Id. While this is inconsistent with an inability to maintain a stationary neck position, the special care taken by Mr. Grazier to enable this activity eliminates it as a valid basis for rejecting the particular opinion of Dr. Brett.

However, the ALJ's third reason for rejecting these restrictions is more problematic for Mr. Grazier. There is evidence which suggests that as of the dates of the two hearings, February 2002 and March 2003, these restrictions were no longer in effect, so that the ALJ was not required to incorporate them into the hypothetical questions he addressed to the VE's. When Dr. Brett imposed the restrictions in January 2000, his preprinted form stated that the restrictions were temporary. Tr. 287. Although Dr. Brett continued these restrictions on April 25, 2000, and further

stated that Mr. Grazier had a "moderate permanent partial disability as a result of his motor vehicle accident," it is not clear from this evidence whether Dr. Brett intended the restriction on repetitive exertion with the arms or maintaining awkward or stationary neck positions to be a permanent restriction. Such an inference is vitiated by Dr. Brett's subsequent notations on July 12, 2000 that Mr. Grazier's cervical range of motion was "only slightly reduced," with only "mild paracervical muscle spasm," that his July 1, 2000 x-rays showed excellent post-operative appearance, and that Dr. Brett had reassured Mr. Grazier "as to the benign nature of his discomfort." See tr. 283. Subsequent practitioners did not impose these restrictions on Mr. Grazier, and in fact, Dr. Janssen refused to attest to Mr. Grazier's permanent disability in September 2000, Dr. Lawler reportedly found Mr. Grazier's limitations in cervical range of motion to be "exaggerated," and Dr. Yerby thought Mr. Grazier's limitation of motion "consistent with a cervical fusion, but more restricted than one would expect." Tr. 363. Dr. Yerby noted one positive Waddell's sign, and discrepancies between the areas of tenderness and the historical level of the surgery. And at the second hearing, in March 2003, Mr. Grazier himself testified that he thought he was capable of looking up at sheet rock, studs and nails, and capable of climbing into attics and crawl spaces.

On the other hand, Mr. Grazier's date last insured for purposes of disability benefits was June 30, 2000. As of that date, Dr. Brett's restrictions on repetitive movements of the arms and on

awkward or stationary positions of the neck remained in effect, and the ALJ should have considered them in determining whether Mr. Grazier was eligible for a closed period of disability benefits. So, while the ALJ's rejection of Dr. Brett's opinion regarding disability as of the time of the hearings, and thus into the future, is supported by substantial evidence, this does not answer the issue of whether Mr. Grazier was ever disabled, and if so, whether that disability lasted long enough to support an award of benefits for a closed period of disability. This is an open issue that should be addressed in further proceedings, as discussed below.

I recommend that the ALJ's rejection of Dr. Brett's opinion regarding disability as of the time of the hearings, and thus into the future, be accepted.

2.  Rejection of Ms. Welker's opinions

Mr. Grazier argues that the ALJ failed to give "specific and legitimate" reasons for rejecting the opinions of Carla Welker that he had "extreme" difficulties in maintaining concentration, persistence or pace, "severe" limitations on his ability to understand and remember detailed instructions, and "marked" difficulties in maintaining social functioning. Mr. Grazier argues that these opinions are sufficient to find him disabled from any employment.

Under Social Security regulations, only acceptable medical sources are qualified to provide evidence that establishes a medically determinable impairment. 20 C.F.R. § 404.1513(a).

Medically acceptable sources are licensed physicians, licensed or certified psychologists, and licensed optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. § 404.1513(a). Ms. Welker does not fall within any of these categories and therefore is not considered an "acceptable medical source." Moreover, the ALJ found that her opinions were contradicted by those of Dr. Wicher, who, as a licensed psychologist, is an acceptable medical source. Mr. Grazier is mistaken that the ALJ was required to supply "specific and legitimate reasons" for rejecting Ms. Welker's opinions.

As a lay witness, Ms. Welker is not competent to offer opinions amounting to medical diagnoses, although she may testify as to a claimant's symptoms or how an impairment affects an ability to work from her observations. Nguyen v. Chater, 100 F.3d 1462 (9th Cir. 1996). The Commissioner must take into account a lay witness's testimony about a claimant's symptoms, unless the ALJ gives a specific reason, germane to the witness for discounting or disregarding it. Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993).

The ALJ rejected Ms. Welker's opinions because he found them "inconsistent with the claimant's daily activities and the treatment record as discussed above" and because they were inconsistent with the opinions of Dr. Wicher. The ALJ's finding that Ms. Welker's opinions conflict with those of an acceptable medical source, Dr. Wicher, is a specific and germane reason for rejecting them. Dr. Wicher's conclusion that Mr. Grazier had normal

intelligence, and did not have memory or concentration deficits, was supported by psychological testing. Ms. Welker's observations were not. I therefore find no error in the ALJ's rejection of Ms. Welker's opinion that Mr. Grazier suffered from extreme difficulties in maintaining concentration, persistence or pace and severe limitations on his ability to understand and remember even short and simple instructions.

With respect to Mr. Grazier's ability to maintain social functioning, Mr. Grazier argues that Dr. Wicher's opinions are based on a single evaluation and his own denial during that evaluation of problems getting along with other people. He points to other evidence in the record, involving situations of conflict with authority figures and others, which contradicts his statement to Dr. Wicher.

This argument is unpersuasive. Many of the conflict situations Mr. Grazier cites are unsubstantiated by anything but Mr. Grazier's testimony, which the ALJ found not credible. These include fights in junior high school and high school, problems with authority in the military, disputes with Mr. Swain's subcontractors, confrontations with the police at homeless camps, estrangement from two siblings, being ordered off a bus by a bus driver, and arguments with store clerks, government workers, and fellow residents of the SRO.

While there is corroborating evidence of Mr. Grazier's displaying hostility to the staff at Ryles Center, and of a verbal confrontation with the police over a shoplifting charge the day of

FINDINGS AND RECOMMENDATION Page 44

his GA hearing, these incidents are not sufficient to establish that Mr. Grazier has marked difficulties in maintaining social functioning, particularly in the context of other testimony from Mr. Grazier that he maintained continuous employment over a period of approximately 15 years, including working as a foreman, even though he was using methamphetamines throughout that time.

> 3. <u>Rejection of the findings of Oregon's Department of Human Services that Mr. Grazier met the requirements for Social Security Listing 12.04</u>

Mr. Grazier asserts that the ALJ erred when he failed to consider, and therefore implicitly rejected, the disability findings of Oregon's Department of Human Services that Mr. Grazier was eligible for state disability benefits. He urges the court to credit the improperly rejected state agency findings as true and to remand for payment of benefits.

When evidence has been improperly rejected, the court may credit that evidence as true rather than remanding a disability case for further proceedings. The "crediting as true" rule is a prudential one that is applied when the evidence is strongly in the claimant's favor and the equities are against further delay. See <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996). However, the court has flexibility in crediting improperly rejected evidence if substantial questions remain before a disability determination can be made. <u>Connett v. Barnhart</u>, 340 F.3d 871 (9th Cir. 2003).

In <u>McCartey v. Massanari</u>, 298 F.3d 1072 (9th Cir. 2002) the court held, as a matter of first impression, that the ALJ must ordinarily give great weight to a Veterans Administration

FINDINGS AND RECOMMENDATION Page 45

determination of disability. The court's holding was based on the "marked similarity between these two federal disability programs." 298 F.3d at 1076. In this case, the Department of Human Services's determination of disability was based upon the same criteria used by the Commissioner of Social Security in the Social Security regulations. Moreover, the ALJ was specifically directed by the Appeals Council to consider this evidence. Tr. 96, 529. The ALJ's failure to consider this evidence, and his failure to give any reason for failing to consider it, was error.

However, I decline Mr. Grazier's urging to credit this evidence as true and remand for an award of benefits, for two reasons. First, I note that although the Department of Human Services found that Mr. Grazier had a mental impairment which equaled Listing 12.04, it did so on the basis of Ms. Welker's treatment notes, her opinion that Mr. Grazier had moderate restrictions in concentration, and her opinion that Mr. Grazier experienced one episode of decompensation. For the reasons discussed above, under Social Security regulations, Ms. Welker is not an acceptable medical source, and therefore not a competent witness on these matters in a Social Security benefits determination. Second, even with the use of extensive evidence from Ms. Welker, the Department of Human Services characterized Mr. Grazier's as a "very close case." Tr. 479. Because the Commissioner is precluded from giving the same weight to Ms. Welker's opinions that the state agency gave them, I am unconvinced that the state agency's findings should be credited as true and the case remanded

for the payment of benefits on that basis. Rather, I recommend that this case be remanded to the Commissioner for consideration of this evidence.

///

4. <u>The hypothetical to the VE</u>

Once a Social Security claimant establishes a prima facie case of disability by showing that his impairment prevents him from performing his previous occupation, the burden shifts to the Commissioner to show that the claimant can perform other types of work that exist in the national economy, given his residual functional capacity (RFC), age, education, and work experience. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289 (9th Cir. 1996).

RFC is what a claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). In making a RFC determination, the Commissioner must consider all factors that might have a "significant impact on an individual's ability to work." <u>Erickson v. Shalala</u>, 9 F.3d 813, 817 (9th Cir. 1993) This includes subjective symptoms such as fatigue and pain. See 20 C.F.R. § 404.1529(d).

The Commissioner can meet his burden of proof by propounding to a VE a hypothetical that is based on medical assumptions supported by substantial evidence in the record and that reflects all the claimant's limitations. <u>Roberts v. Shalala</u>, 66 F.3d 179, 184 (9th Cir. 1995). If the hypothetical propounded to the VE does not reflect all of disability claimant's limitations, the VE's testimony has no evidentiary value to support the finding that

FINDINGS AND RECOMMENDATION Page 47

claimant can perform jobs in national economy. _Matthews_, 10 F.3d at 681.

Mr. Grazier contends that the ALJ's hypothetical to the VEs was incomplete because it did not include Dr. Brett's limitation on repetitive use of the upper extremities and preclusion of awkward or stationary neck positions. For the reasons discussed above, I find no error because the evidence does not require a finding that these restrictions remained in effect as of the hearings in February 2002 and March 2003.

Mr. Grazier argues that the ALJ should have included in the hypothetical the likelihood that Mr. Grazier would require more than one unscheduled absence from work per month. VEs Ott and Male testified that such a limitation would preclude employment. However, such a limitation is unsupported by substantial evidence in the record. Although Mr. Grazier testified that he is required to lie down after sitting for more than half an hour, that he is always tired, and that he suffers from incapacitating headaches that require him to lie down for an entire day, the ALJ found Mr. Grazier's testimony not credible, and Mr. Grazier has not challenged the ALJ's adverse credibility findings. Further, there is no evidence of a medical condition which would reasonably be expected to produce such symptoms. The medical evidence shows a complaint to Dr. Janssen in January 2001 of headaches of two weeks' duration associated with "slight nausea," to Dr. Yerby in March 2001 of "occasional headaches" and to Dr. Lee of a headache in August 2001. This evidence does not support Mr. Grazier's testimony

FINDINGS AND RECOMMENDATION Page 48

of a severe headache once a month so severe that it is unaffected by Vicodin and requires him to lie down for a full day, and therefore does not support excessive absenteeism in the hypothetical question to the VEs.

Mr. Grazier asserts that the ALJ should have included in the hypothetical a limitation based on episodes of volatile temper directed at supervisors once a month. The evidence does not support such a limitation. Mr. Grazier testified to a previous employment history characterized by a successful working relationship with two employers over many years, including acting as a job foreman; he also told Dr. Wicher that he did not have problems getting along with others and denied episodes of psychological deterioration at work.

Mr. Grazier asserts that the ALJ should have included in the hypothetical to the VE that he had marked difficulty with focus or concentration, as found by Ms. Welker. However, as discussed above, such a limitation is unsupported by competent medical evidence and contradicted by Dr. Wicher's psychological testing in May 2001, which showed normal IQ and normal memory and concentration abilities. Even Ms. Welker's supervisor, Dr. Bischof, found in October 2001 that Mr. Grazier's short-term and long-term memory were intact to testing.

5.   Identification and consideration of all impairments

Mr. Grazier asserts that the ALJ erred in not recognizing vestibular disorder and hearing loss as severe impairments and considering their effects in combination with Mr. Grazier's other

FINDINGS AND RECOMMENDATION Page 49

impairments. The ALJ is required to consider the combined effect of all the claimant's impairments, rather than isolating the effects of different impairments and considering them separately. <u>Lester v. Chater</u>, 81 F.3d 821 (9th Cir. 1995), <u>Gregory v. Bowen</u>, 844 F.2d 664, 666 (9th Cir. 1988); 42 U.S.C. § 1382c(a)(3)(G); see 20 C.F.R. § 404.1523.

Mr. Grazier's argument is unpersuasive because the evidence does not support a finding that Mr. Grazier's hearing loss and vestibular disorder were severe. Mr. Grazier's audiogram indicated only mild to moderate bilateral high frequency hearing loss, consistent with noise exposure, but that he retained good word recognition ability. The vestibular studies were normal in several respects, showing only mild vestibular dysfunction, which caused him to have to rely on vision to maintain his balance, rather than vestibular cues.

**Conclusion**

Mr. Grazier urges the court to credit the improperly rejected evidence as true and remand this case for an award of benefits. In <u>Smolen</u>, 80 F.3d at 1292, the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. If the <u>Smolen</u> test is satisfied, then remand for payment

FINDINGS AND RECOMMENDATION Page 50

of benefits is warranted regardless of whether the ALJ *might* have articulated adequate findings. <u>Harman</u> at 1173.

I am not persuaded that the <u>Smolen</u> test is satisfied in this case. The ALJ has yet to comply with the Appeals Council's order that he consider the findings of the Oregon Department of Human Resources; the applicability of the state agency's finding that Mr. Grazier meets the criteria for Listing 12.05 therefore remains an open issue. The applicability of Dr. Brett's restrictions on repetitive use of the arms and on awkward or stationary positions of the neck, for a closed period of disability, and beginning and ending dates for that closed period, are also open issues. I recommend that this case be remanded to the Commissioner for additional proceedings to resolve these issues.

**Scheduling Order**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due June 20, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due July 5, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 3rd day of <u>June</u>, 2005.


<u>/s/  Dennis James Hubel</u>

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 51